# UNITED STATES DISTRICT COURT

for the

District of Columbia

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) | Case No. 21-SC-395 |
| INFORMATION ASSOCIATED WITH ONE ACCOUNT STORED AT PREMISES CONTROLLED BY PARLER, LLC PURSUANT TO 18 U.S.C. 2703 FOR INVESTIGATION OF VIOLATION OF 18 U.S.C. §§ 111(a), 231(a), 1512(c), 1752(a), 40 U.S.C. § 5104(e) | ) ) ) ) | |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

SEE ATTACHMENT A

located in the _____ District of _____ Nevada _____ , there is now concealed *(identify the person or describe the property to be seized)*:

SEE ATTACHMENT B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §111(a)(1) | - Assaulting, Resisting, or Impeding Certain Officers or Employees |
| 18 U.S.C. § 231(a)(3) | - Impeding Law Enforcement in Performance of Official Duties |
| 18 U.S.C. § 1512(c)(2) | - Obstruction of an Official Proceeding |
| 18 U.S.C. § 1752(a)(1), (2), and (4) | - Knowingly Entering and Remaining in Restricted Grounds to Disrupt Government Business |
| 40 U.S.C. § 5104(e)(2)(A), (B), (C), (D), (F), and (G) | - Violent Entry and Disorderly Conduct on Capitol Grounds |

The application is based on these facts:

SEE AFFIDAVIT

☐ Continued on the attached sheet.

☑ Delayed notice of  180  days *(give exact ending date if more than 30 days:*   08/02/2021   *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Special Agent Daniel Mehochko, FBI
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____ Telephone _____ *(specify reliable electronic means)*.

Date:   02/03/2021   

_____
*Judge's signature*

City and state:  Washington, D.C.  

Zia M. Faruqui, United States Magistrate Judge
_____
*Printed name and title*

AO 93C  (08/18)  Warrant by Telephone or Other Reliable Electronic Means       ☑ Original       ☐ Duplicate Original

# UNITED STATES DISTRICT COURT
for the
District of Columbia

| | |
|---|---|
| In the Matter of the Search of )<br>*(Briefly describe the property to be searched*<br>*or identify the person by name and address)* )<br> )<br>**INFORMATION ASSOCIATED WITH ONE ACCOUNT STORED AT PREMISES** )<br>**CONTROLLED BY PARLER, LLC PURSUANT TO 18 U.S.C. 2703 FOR** )<br>**INVESTIGATION OF VIOLATION OF 18 U.S.C. §§ 111(a), 231(a), 1512(c), 1752(a), 40** )<br>**U.S.C. § 5104(e)** ) | Case No.  21-SC-395 |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:       Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____ District of _____Nevada_____
*(identify the person or describe the property to be searched and give its location)*:

SEE ATTACHMENT A

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

SEE ATTACHMENT B

**YOU ARE COMMANDED** to execute this warrant on or before _____February 16, 2021_____ *(not to exceed 14 days)*
☐ in the daytime 6:00 a.m. to 10:00 p.m.   ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____Zia M. Faruqui_____ .
*(United States Magistrate Judge)*

☑ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for _____ days *(not to exceed 30)*   ☑ until, the facts justifying, the later specific date of _____08/02/2021_____ .

Date and time issued:     _____02/03/2021_____          _____
                                                                                          *Judge's signature*

City and state:       _____Washington, D.C._____        Zia M. Faruqui, United States Magistrate Judge
                                                                                          *Printed name and title*

AO 93C  (08/18) Warrant by Telephone or Other Reliable Electronic Means (Page 2)

| **Return** | | |
|---|---|---|
| Case No.:<br>  21-SC-395 | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name(s) of any person(s) seized: | | |

| **Certification** |
|---|

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.


Date:  _____

_____
*Executing officer's signature*

_____
*Printed name and title*

AO 95
(Rev. 09/12)

# ADMINISTRATIVE OFFICE OF THE UNITED STATES COURTS

## DELAYED-NOTICE SEARCH WARRANT REPORT

The information on this form should be submitted each time judicial action is taken on an application for a delayed-notice search warrant or for an extension of a delayed-notice period.  See 18 U.S.C. § 3103a(d)(1).
NOTE:   If an extension to the notice period is requested, information will need to be submitted for each extension.

**Please enter the information on this form into the** <u>InfoWeb</u> **Delayed-Notice Search Warrant Reporting System on the J-Net or into CM/ECF version 6.0 or later, if available.**

For more information, see the <u>Delayed-Notice Search Warrant</u> page on the J-Net.

1.   **Name of Judge:**   Zia M. Faruqui, United States Magistrate Judge          ( ☐ check if state court judge)

2.   **Federal Judicial District:**   District of Columbia

3.   **Date of Application for Delayed Notice:**   02/03/2021

4.   **Offense (Most Serious) Specified:**
☐ Drugs          ☐ Fraud          ☐ Weapons          ☐ Immigration          ☐ Terrorism
☐ Sex Offenses          ☐ Theft          ☐ Kidnapping          ☐ Tax
☐ Extortion/Racketeering          ☐ Fugitive/Escape/Supervised Release Violation
☑ Other *(specify)*:   Assaulting, Resisting or Impeding an Officer of the United States

5.   **Type of Application:**   ☑ Initial request for delay
☐ Extension of previously authorized delay
*(Number of extensions previously granted:* _____ *)*

6.   **Judicial Action Taken:**   ☐ Denied          ☐ Granted          ☐ Granted as modified

7.   **Case Number (e.g., 'mc' Number) of Warrant:**   _____ : 21  -  sc  -  395
                                                                                     *office*    *year*    *type*    *number*

8.   **Period of Delay Authorized in This Action (days):**   180

9.   **Preparer's Name:**   Kimberly Paschall          **Title:**  Assistant United States Attorney
     **Phone number:**   (202) 252-2650          **Date of report:** 02/03/2021

## ATTACHMENT A
**Property to Be Searched**

This warrant applies to information which is associated with the Parler account identified by **PatriotBruno** which is stored at premises owned, maintained, controlled, or operated by Parler, LLC, a company that accepts service of legal process at 209 South Stephanie Street B135, Henderson, Nevada 89012.

## ATTACHMENT B

**Particular Things to be Seized and Procedures
to Facilitate Execution of the Warrant**

I.    **Information to be disclosed by Parler, LLC ("PROVIDER") to facilitate
execution of the warrant**

To the extent that the information described in Attachment A is within the possession,
custody, or control of PROVIDER, including any records that have been deleted but are still
available to PROVIDER, or have been preserved pursuant to a request made under 18 U.S.C.
§ 2703(f), PROVIDER is required to disclose the following information to the government
corresponding to each account or identifier ("Accounts") listed in Attachment A:

a.    For the time period **FROM November 8, 2020 TO THE PRESENT**: The contents of
any available messages or other communication associated with the Account
(including, but not limited to, messages, attachments, draft messages, posts, chats,
video calling history, "friend" requests, discussions, recordings, images, or
communications of any kind sent to and from the Account, including stored or
preserved copies thereof) and related transactional records for all PROVIDER services
used by an Account subscriber/user, including the source and destination addresses and
all Internet Protocol ("IP") addresses associated with each message or other
communication, the date and time at which each message or other communication was
sent, and the size and length of each message or other communication;

b.    For the time period **FROM November 8, 2020 TO THE PRESENT**:  All photos and
videos uploaded by the Account and all photos or videos uploaded in which the
Account has been "tagged", including Exchangeable Image File ("EXIF") data and any
other metadata associated with those photos and videos;

c.  For the time period **FROM November 8, 2020 TO THE PRESENT**: Basic subscriber records and login history, including all records or other information regarding the identification of the Account, to include full name, physical address, telephone numbers, birthdate, security questions and passwords, and other personal identifying information, records of session times and durations, the date on which the Account was created, the length of service, types of services utilized by the Account, the IP address used to register the Account, log-in IP addresses associated with session times and dates, account status, alternative e-mail addresses provided during registration, methods of connecting, log files, means and source of payment (including any credit or bank account number), and any account(s) linked by machine cookies (meaning all Parler user identification numbers ("user IDs") that logged into Parler by the same machine as the Account;

d.  For the time period **FROM November 8, 2020 TO THE PRESENT**:  All records or other information related to the Account, including address books, contact and "friend" lists, calendar data, and files; profile information;  Notes; groups and networks of which the Account is a member; future and past event postings; rejected "friend" requests and blocked users; "muted" users; user "subscriptions"; status updates; comments; "parleys"; "hashtags"; "echos"; the account's usage of the "upvote" or "downvote" feature, including all Parler posts and all non-Parler webpages and content that the user has "upvoted" or commented on; searches performed by the Account; privacy settings, including privacy settings for individual Parler posts, "parleys," and activities; information about the Account's access and use of Parler applications;

e.  For the time period **FROM November 8, 2020 TO THE PRESENT**:  All "check ins" and other location information;

f.  For the time period **FROM November 8, 2020 TO THE PRESENT**:  All records pertaining to communications between PROVIDER and any person regarding the Account, including contacts with support services and records of actions taken;

g.  For the time period **FROM November 8, 2020 TO THE PRESENT**: All records pertaining to devices associated with the Account and software used to create and access the Account, including device serial numbers, instrument numbers, model types/numbers, International Mobile Equipment Identities ("IMEI"), Mobile Equipment Identifiers ("MEID"), Global Unique Identifiers ("GUID"), Electronic Serial Numbers ("ESN"), Android Device IDs, phone numbers, Media Access Control ("MAC") addresses, operating system information, browser information, mobile network information, information regarding cookies and similar technologies, and any other unique identifiers that would assist in identifying any such device(s), including unique application numbers and push notification tokens associated with the Account (including Apple Push Notifications ("APN"), Google Cloud Messaging ("GCM"), Microsoft Push Notification Service ("MPNS"), Windows Push Notification Service ("WNS"), Amazon Device Messaging ("ADM"), Firebase Cloud Messaging ("FCM"), and Baidu Cloud Push);

h.  For the time period **FROM November 8, 2020 TO THE PRESENT**: All information held by PROVIDER related to the location and location history of the user(s) of the Account, including geographic locations associated with the Account (including those collected for non-PROVIDER based applications), IP addresses, Global Positioning

System ("GPS") information, and information pertaining to nearby devices, Wi-Fi access points, and cell towers; and

i.   Information about any complaint, alert, or other indication of malware, fraud, or terms of service violation related to the Account or associated user(s), including any memoranda, correspondence, investigation files, or records of meetings or discussions about the Account or associated user(s) (but not including confidential communications with legal counsel).

Within **14 DAYS** of the issuance of this warrant, PROVIDER shall deliver the information set forth above via United States mail, courier, or e-mail to the following:

**Special Agent Dan Mehochko, <u>damehochko@fbi.gov</u>, Special Agent John McBrien, <u>jwmcbrien@fbi.gov</u>**

## II.   Information to be seized by the government

All information described above in Section I that constitutes fruits, contraband, evidence and instrumentalities of violations of 18 U.S.C. § 111(a)(1); 18 U.S.C. § 231(a)(3); 18 U.S.C. § 1512(c)(2); 18 U.S.C. § 1752(a)(1), (2), and (4); 40 U.S.C. § 5104(e)(2)(A), (B), (C), (D), (F), and (G), as described in the affidavit submitted in support of this Warrant, including, for each Account, information pertaining to the following matters:

(a) Information that constitutes evidence of the identification or location of the user(s) of the Account;

(b) Information that constitutes evidence concerning persons who either (i) collaborated, conspired, or assisted (knowingly or unknowingly) the commission of the criminal activity under investigation; or (ii) communicated with the Account about matters relating to the criminal activity under investigation, including records that help reveal their whereabouts;

(c) Information that constitutes evidence indicating the Account user's state of mind, *e.g.*, intent, absence of mistake, or evidence indicating preparation or planning, related to the criminal activity under investigation;

(d) Information that constitutes evidence concerning how and when the Account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crime under investigation and to the Account user;

(e) Information that constitutes evidence concerning forcible assaulting, resisting, opposing, impeding, or interfering with any officer or employee of the United States while in engaged in or on account of the performance of official duties;

(f)  Information that constitutes evidence concerning planning or attempts to conduct unlawful acts or attempts to commit any unlawful act to obstruct, impede, or interfere with any fireman or law enforcement officer lawfully engaged in the lawful performance of his official duties incident to and during the commission of a civil disorder;

(g)  Information that constitutes evidence concerning planning or attempts to obstruct, influence, or impede any official proceeding, or attempt to do so;

(h)  Information that constitutes evidence concerning planning or attempts to (1) knowingly enter or remain in any restricted building or grounds without lawful authority to do; (2) evidence of planning or attempts to knowingly, and with intent to impede or disrupt the orderly conduct of Government business or official functions, engage in disorderly or disruptive conduct in, or within such proximity to, any restricted building or grounds when, or so that, such conduct, in fact, impedes or disrupts the orderly conduct of Government business or official functions; and (3) evidence of planning or attempts to knowingly engage in any act of physical violence against any person or property in any restricted building or grounds;

(i)  Information that constitutes evidence concerning planning or attempts to willfully and knowingly (A) enter or remain on the floor of either House of Congress or in any cloakroom or lobby adjacent to that floor, in the Rayburn Room of the House of Representatives, or in the Marble Room of the Senate, unless authorized to do so pursuant to rules adopted, or an authorization given, by that House; (B) enter or remain in the gallery of either House of Congress in violation of rules governing

admission to the gallery adopted by that House or pursuant to an authorization given by that House; (C) with the intent to disrupt the orderly conduct of official business, enter or remain in a room in any of the Capitol Buildings set aside or designated for the use of— (i) either House of Congress or a Member, committee, officer, or employee of Congress, or either House of Congress; or (ii) the Library of Congress; (D) utter loud, threatening, or abusive language, or engage in disorderly or disruptive conduct, at any place in the Grounds or in any of the Capitol Buildings with the intent to impede, disrupt, or disturb the orderly conduct of a session of Congress or either House of Congress, or the orderly conduct in that building of a hearing before, or any deliberations of, a committee of Congress or either House of Congress; (F) engage in an act of physical violence in the Grounds or any of the Capitol Buildings; and (G) parade, demonstrate, or picket in any of the Capitol Buildings.

(j)  Information that constitutes evidence concerning planning, funding for and travel to Washington, D.C. and to the U.S. Capitol on or before January 6, 2021.

**III.     Government procedures for warrant execution**

The United States government will conduct a search of the information produced by the PROVIDER and determine which information is within the scope of the information to be seized specified in Section II.  That information that is within the scope of Section II may be copied and retained by the United States.

Law enforcement personnel will then seal any information from the PROVIDER that does not fall within the scope of Section II and will not further review the information absent an order of the Court. Such sealed information may include retaining a digital copy of all information received pursuant to the warrant to be used for authentication at trial, as needed.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH ONE ACCOUNT STORED AT PREMISES CONTROLLED BY PARLER, LLC PURSUANT TO 18 U.S.C. 2703 FOR INVESTIGATION OF VIOLATION OF 18 U.S.C. §§ 111(a), 231(a), 1512(c), 1752(a), 40 U.S.C. § 5104(e) | Case No.: 21-SC-395 <br><br> **FILED UNDER SEAL** |

Reference:     *USAO Ref. # 2021R00162/2021R00460; Subject Account(s): PatriotBruno*

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Daniel Mehochko, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of an application for a search warrant for information which is associated with account PatriotBruno, which is stored at premises controlled by Parler, LLC ("PROVIDER"), an electronic communications services provider and/or remote computing services provider which is headquartered at 209 South Stephanie Street B135, Henderson, Nevada 89012.   The information to be searched is described in the following paragraphs and in Attachment A.  This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A) to require PROVIDER to disclose to the government copies of the information (including the content of communications) further described in Section I of Attachment B.  Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B, using the procedures described in Section III of Attachment B.

2.      I am a Special Agent of the Federal Bureau of Investigation (FBI), and have been so employed since May 2006. As a Special Agent, I have investigated and supervised investigations of violations of federal statutes, including but not limited to counterintelligence, public corruption, bribery, false statements, computer intrusion, kidnapping, terrorism, and other national security matters. I currently am assigned to Squad CR-15 of the FBI's Washington Field Office, Northern Virginia Resident Agency, and I am tasked with investigating public corruption investigations, including foreign influence and obstruction of justice. In the course of my duties, I have conducted and participated in numerous investigations. Among other things, I have participated in and supervised the execution of arrest and search warrants, including warrants authorizing the search and seizure of electronic evidence maintained by internet and e-mail service providers.

3.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, witnesses, and agencies. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant. It does not set forth all of my knowledge, or the knowledge of others, about this matter.

4.      Based on my training and experience and the facts as set forth in this affidavit, I respectfully submit that there is probable cause to believe that violations of Title 18, United States Code ("U.S.C.") Section ("§") 111(a)(1) (Assaulting, Resisting, or Impeding Certain Officers or Employees); Title 18 U.S.C. § 231(a)(3) (Impeding Law Enforcement in Performance of Official Duties); Title 18 U.S.C. § 1512(c)(2) (Obstruction of an Official Proceeding); Title 18 U.S.C. § 1752(a)(1), (2), and (4) (Knowingly Entering and Remaining in Restricted Grounds to Disrupt Government Business); and Title 40 U.S.C. § 5104(e)(2)(A), (B), (C), (D), (F), and (G) (Violent Entry and Disorderly Conduct on Capitol Grounds) (the "Subject Offenses") have been committed

by BRUNO JOSEPH CUA (hereinafter, CUA). There is also probable cause to search the information described in Attachment A for evidence, instrumentalities, contraband or fruits of these crimes further described in Attachment B.

## JURISDICTION

5.      This Court has jurisdiction to issue the requested warrant because it is a "court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A), and (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i). As discussed more fully below, acts or omissions in furtherance of the offenses under investigation occurred within Washington, D.C. *See* 18 U.S.C. § 3237.

## PROBABLE CAUSE

### *Background – The U.S. Capitol on January 6, 2021*

6.      USCP, the FBI, and assisting law enforcement agencies are investigating a riot and related offenses that occurred at the United States Capitol Building, located at 1 First Street, NW, Washington, D.C., 20510 at latitude 38.88997 and longitude -77.00906 on January 6, 2021.

7.      At the U.S. Capitol, the building itself has 540 rooms covering 175,170 square feet of ground, roughly four acres. The building is 751 feet long (roughly 228 meters) from north to south and 350 feet wide (106 meters) at its widest point. The U.S. Capitol Visitor Center is 580,000 square feet and is located underground on the east side of the Capitol. On the west side of the Capitol building is the West Front, which includes the inaugural stage scaffolding, a variety of open concrete spaces, a fountain surrounded by a walkway, two broad staircases, and multiple terraces at each floor. On the East Front are three staircases, porticos on both the House and Senate

side, and two large skylights into the Visitor's Center surrounded by a concrete parkway.  All of this area was barricaded and off limits to the public on January 6, 2021.

8.      The U.S. Capitol is secured 24 hours a day by USCP.  Restrictions around the U.S. Capitol include permanent and temporary security barriers and posts manned by USCP.  Only authorized people with appropriate identification are allowed access inside the U.S. Capitol.

9.      On January 6, 2021, the exterior plaza of the U.S. Capitol was closed to members of the public.

10.      On January 6, 2021, a joint session of the United States Congress convened at the U.S. Capitol.  During the joint session, elected members of the United States House of Representatives and the United States Senate were meeting in separate chambers of the U.S. Capitol to certify the vote count of the Electoral College of the 2020 Presidential Election, which took place on November 3, 2020 ("Certification").  The joint session began at approximately 1:00 p.m. Eastern Standard Time (EST).  Shortly thereafter, by approximately 1:30 p.m., the House and Senate adjourned to separate chambers to resolve a particular objection.  Vice President Mike Pence was present and presiding, first in the joint session, and then in the Senate chamber.

11.      As the proceedings continued in both the House and the Senate, and with Vice President Mike Pence present and presiding over the Senate, a large crowd gathered outside the U.S. Capitol.  As noted above, temporary and permanent barricades were in place around the exterior of the U.S. Capitol building, and USCP were present and attempting to keep the crowd away from the Capitol building and the proceedings underway inside.

12.      At around 1:00 p.m. EST, known and unknown individuals broke through the police lines, toppled the outside barricades protecting the U.S. Capitol, and pushed past USCP and supporting law enforcement officers there to protect the U.S. Capitol.

4

13.    At around 1:30 p.m. EST, USCP ordered Congressional staff to evacuate the House Cannon Office Building and the Library of Congress James Madison Memorial Building in part because of a suspicious package found nearby.  Pipe bombs were later found near both the Democratic National Committee and Republican National Committee headquarters.

14.    Media reporting showed a group of individuals outside of the Capitol chanting, "Hang Mike Pence."  I know from this investigation that some individuals believed that Vice President Pence possessed the ability to prevent the certification of the presidential election and that his failure to do so made him a traitor.

15.    At approximately 2:00 p.m., some people in the crowd forced their way through, up, and over the barricades and law enforcement.  The crowd advanced to the exterior façade of the building.  The crowd was not lawfully authorized to enter or remain in the building and, prior to entering the building, no members of the crowd submitted to security screenings or weapons checks by U.S. Capitol Police Officers or other authorized security officials.  At such time, the certification proceedings were still underway and the exterior doors and windows of the U.S. Capitol were locked or otherwise secured.  Members of law enforcement attempted to maintain order and keep the crowd from entering the Capitol.

16.    Shortly after 2:00 p.m., individuals in the crowd forced entry into the U.S. Capitol, including by breaking windows and by assaulting members of law enforcement, as others in the crowd encouraged and assisted those acts.  Publicly available video footage shows an unknown individual saying to a crowd outside the Capitol building, "We're gonna fucking take this," which your affiant believes was a reference to "taking" the U.S. Capitol.



17.     Shortly thereafter, at approximately 2:20 p.m. members of the United States House of Representatives and United States Senate, including the President of the Senate, Vice President Mike Pence, were instructed to—and did—evacuate the chambers.  That is, at or about this time, USCP ordered all nearby staff, Senators, and reporters into the Senate chamber and locked it down. USCP ordered a similar lockdown in the House chamber.  As the subjects attempted to break into the House chamber, by breaking the windows on the chamber door, law enforcement were forced to draw their weapons to protect the victims sheltering inside.

18.     At approximately 2:30 p.m. EST, known and unknown subjects broke windows and pushed past USCP and supporting law enforcement officers forcing their way into the U.S. Capitol on both the west side and the east side of the building.  Once inside, the subjects broke windows and doors, destroyed property, stole property, and assaulted federal police officers.  Many of the federal police officers were injured, several were admitted to the hospital, and at least one federal police officer died as a result of the injuries he sustained. The subjects also confronted and

terrorized members of Congress, Congressional staff, and the media.  The subjects carried weapons including tire irons, sledgehammers, bear spray, and Tasers.  They also took police equipment from overrun police including shields and police batons.  At least one of the subjects carried a handgun with an extended magazine.  These actions by the unknown individuals resulted in the disruption and ultimate delay of the vote Certification.

19.     Also at approximately 2:30 p.m. EST, USCP ordered the evacuation of lawmakers, Vice President Mike Pence, and president pro tempore of the Senate, Charles Grassley, for their safety.

20.     At around 2:45 p.m. EST, subjects broke into the office of House Speaker Nancy Pelosi.

21.     At around 2:47 p.m., subjects broke into the United States Senate Chamber. Publicly available video shows an individual asking, "Where are they?" as they opened up the door to the Senate Chamber.  Based upon the context, law enforcement believes that the word "they" is in reference to members of Congress.



22.   After subjects forced entry into the Senate Chamber, publicly available video shows that an individual asked, "Where the fuck is Nancy?"  Based upon other comments and the context, law enforcement believes that the "Nancy" being referenced was the Speaker of the House of Representatives, Nancy Pelosi.



23.   An unknown subject left a note on the podium on the floor of the Senate Chamber. This note, captured by the filming reporter, stated "A Matter of Time Justice is Coming."



24.     During the time when the subjects were inside the Capitol building, multiple subjects were observed inside the US Capitol wearing what appears to be, based upon my training and experience, tactical vests and carrying flex cuffs.  Based upon my knowledge, training, and experience, I know that flex cuffs are a manner of restraint that are designed to be carried in situations where a large number of individuals were expected to be taken into custody.





25.     At around 2:48 p.m. EST, D.C. Mayor Muriel Bowser announced a citywide curfew beginning at 6:00 p.m.

26.     At around 2:45 p.m. EST, one subject was shot and killed while attempting to break into the House chamber through the broken windows.

27.     At about 3:25 p.m. EST, law enforcement officers cleared the Senate floor.

28.     Between 3:25 and around 6:30 p.m. EST, law enforcement was able to clear the U.S. Capitol of all of the subjects.

29.     Based on these events, all proceedings of the United States Congress, including the joint session, were effectively suspended until shortly after 8:00 p.m. the same day.  In light of the dangerous circumstances caused by the unlawful entry to the U.S. Capitol, including the danger posed by individuals who had entered the U.S. Capitol without any security screening or weapons check, Congressional proceedings could not resume until after every unauthorized occupant had left the U.S. Capitol, and the building had been confirmed secured.  The proceedings resumed at approximately 8:00 pm after the building had been secured.  Vice President Pence remained in the United States Capitol from the time he was evacuated from the Senate Chamber until the session resumed.

30.     Beginning around 8:00 p.m., the Senate resumed work on the Certification.

31.     Beginning around 9:00 p.m., the House resumed work on the Certification.

32.     Both chambers of Congress met and worked on the Certification within the Capitol building until approximately 3 a.m. on January 7, 2021.

33.     During national news coverage of the aforementioned events, video footage which appeared to be captured on mobile devices of persons present on the scene depicted evidence of violations of local and federal law, including scores of individuals inside the U.S. Capitol building without authority to be there.

34.    Based on my training and experience, I know that it is common for individuals to carry and use their cell phones during large gatherings, such as the gathering that occurred in the area of the U.S. Capitol on January 6, 2021.  Such phones are typically carried at such gatherings to allow individuals to capture photographs and video footage of the gatherings, to communicate with other individuals about the gatherings, to coordinate with other participants at the gatherings, and to post on social media and digital forums about the gatherings.

35.    Many subjects seen on news footage in the area of the U.S. Capitol are using a cell phone in some capacity.  It appears some subjects were recording the events occurring in and around the U.S. Capitol and others appear to be taking photos, to include photos and video of themselves after breaking into the U.S. Capitol itself, including photos of themselves damaging and stealing property.  As reported in the news media, others inside and immediately outside the U.S. Capitol live-streamed their activities, including those described above as well as statements about these activities.

36.    Photos below, available on various publicly available news, social media, and other media show some of the subjects within the U.S. Capitol during the riot.  In several of these photos, the individuals who broke into the U.S. Capitol can be seen holding and using cell phones, including to take pictures and/or videos:





[1] https://losangeles.cbslocal.com/2021/01/06/congresswoman-capitol-building-takeover-an-attempted-coup/

[2] https://www.businessinsider.com/republicans-objecting-to-electoral-votes-in-congress-live-updates-2021-1.

13



### *Facts Specific to This Application*

37.     Beginning on or about January 8, 2021, the FBI received at least two tips identifying BRUNO JOSEPH CUA ("CUA") as a participant in the January 6, 2021 riot at the U.S. Capitol.

38.     COMPLAINANT #1 ("C1"), a sworn Law Enforcement Officer ("LEO"), reported CUA to the FBI on or about January 11, 2021. C1 identified CUA in a photograph from a Washington, D.C. Metropolitan Police Department ("MPD") presentation titled, "PERSONS OF INTEREST IN UNREST-RELATED OFFENSES." C1 has had direct interactions with CUA, including in-person, through C1's official duties as an LEO in the jurisdiction where CUA lives in Milton, Georgia.

---

[3] https://www.thv11.com/article/news/arkansas-man-storms-capitol-pelosi/91-41abde60-a390-4a9e-b5f3-d80b0b96141e

39.     After a follow-up telephone interview with an FBI Agent on January 15, 2021, C1 provided a total of five screenshots/photographs to the FBI, including screenshots of the MPD presentation, and screenshots from CUA's Instagram account, @bruno_cua1776.

40.     C1 identified CUA facing away from the camera, wearing jeans and a dark sweatshirt, holding a jean jacket with tan lining in his left hand, and wearing a red baseball hat with the number "45" on the right side of it in the two screenshots of the MPD presentation. C1 also identified CUA wearing the same clothing—including the red hat with number "45" and the jean jacket with tan lining—in screenshots of two other undated Instagram posts from CUA's Instagram account.[4] CUA also appears to be similar height and build as the subject in MPD's presentation, and has the same hair color. CUA's jean jacket appears to be inside out in the two MPD presentation screenshots.

41.     In the screenshot of an Instagram story from CUA's Instagram account, CUA stated he "stormed" the Capitol and, along with unidentified others, "physically fought our way in." The screenshot was captured at 5:33 PM on January 6, 2021. FBI Agents reviewed the screenshot and determined CUA posted the Instagram story at approximately 5:13 PM on January 6, 2021, based on an Instagram timestamp of "20m" meaning that the story was posted twenty minutes earlier.

---

[4] In the Instagram photos provided by C1, CUA is wearing a dark sweatshirt with a logo on the back of the shirt that appears to be a red, white and blue flag over an eagle. In the MPD presentation and video from The New Yorker from the Senate Chamber on January 6, 2021, CUA is in a similar dark sweatshirt, but with the eagle logo on the front of the sweatshirt. FBI Agents reviewed and compared the screenshots, images, and videos of CUA wearing a sweatshirt. Based on the similarities of the sweatshirt colors and the sweatshirt logos seen separately on the front and back, FBI Agents believe that the sweatshirt is reversible or CUA wears at least two versions of the same sweatshirt; one with the logo on the front and one with the logo on the back. In some instances, the sweatshirt CUA is seen wearing looks brown; in other instances, the sweatshirt looks grey. Additionally, in some instances, the sweatshirt logo is on the front and in other instances the same logo is on the back.



42.     On January 17, 2021, The New Yorker published a video titled, "A Reporter's Video from Inside the Capitol Siege". The video documents individuals as they fought their way inside the U.S. Capitol on January 6, 2021, and shows those who made it all the way to the Senate floor.

43.     The video shows CUA in the Senate Gallery at a video timestamp of approximately 4:21. At a timestamp of approximately 4:27, CUA is seen in front of a marble wall wearing the dark sweatshirt red hat and holding the same jean jacket from screenshots provided by C1. CUA is also holding a cellular phone and appears to be actively filming. At a timestamp of approximately 4:32, CUA is seen facing the camera, wearing the dark sweatshirt, holding the same jean jacket in his left hand, a cellular phone in his right hand, while wearing grey gloves.







44.    In the same video at a timestamp of approximately 4:44, CUA is heard off camera

stating, "They can steal an election, but we can't sit in their chairs?" In an in-person interview with

FBI Agents on January 20, 2021, C1 identified CUA speaking in the video at the same timestamp.



45.     Shortly thereafter, in the same video at a timestamp of approximately 4:45, the camera pans to CUA standing in the back of the Senate Chamber. CUA is seen with his cellular phone in his right hand, the inside-out jean jacket in his left hand, wearing the red hat, and the dark sweatshirt. At this point in the video, the logo of an American flag in the shape of what appears to be an eagle is visible on CUA's sweatshirt.



19

46. On January 20, 2021, FBI Agents conducted an in-person interview of C1. FBI Agents also interviewed WITNESS #1 ("W1") and WITNESS #2 ("W2"), both of whom are sworn LEOs. W1 and W2 positively identified CUA based on their direct and indirect interactions with CUA through their official duties as LEOs in the jurisdiction where CUA lives in Milton, Georgia.

47. C1, W1, and W2 each reviewed the video from The New Yorker after its release on January 17, 2021. C1, W1, and W2 each independently identified CUA as speaking in the video at the same approximate timestamp of 4:44. W1 corroborated the identification of CUA in screenshots of CUA provided by C1. W2 also corroborated the identification of CUA in the same screenshots.

48. In a separate video captured by U.S. Capitol Police ("USCP") closed circuit television ("CCTV") cameras of the events of January 6, 2021, CUA is seen outside the Senate Gallery near S309 at a video timestamp of approximately 0:04. CUA is seen wearing jeans, with the same previously identified jean jacket, dark sweatshirt, and red hat, while holding what appears to be a baton in his right hand and a cellular phone in his left hand.



49.     In the same video at an approximate timestamp of 0:16, CUA is seen outside the Senate Chamber doors, in a physical altercation with USCP plain clothes officers, still holding a baton in his hand. Specifically, CUA can be seen shoving USCP Officer G.L. ("G.L.") in front of the door to the Senate Chambers. CUA is then seen entering the Senate Chambers through the open door at an approximate timestamp of 0:27.





50.      On January 14, 2021, an FBI Agent interviewed G.L. via telephone. On January 6, 2021, G.L., a plain clothes officer with the USCP, was posted at the Senate Chambers with two other USCP officers. All three officers were dressed in suits. G.L. and the two other officers went to the third floor to attempt to lock the doors to the Senate Chambers. While attempting to secure the third floor a large group of people started coming down the hall. A number of individuals attempted to gain access to the room that the officers were trying to secure. Shoving ensued between the officers and at least one of the individuals in the group. G.L. did not recall what any of the individuals looked like or what they were wearing. Video footage from USCP confirms that CUA is one of the rioters who shoved G.L.



51.     In another USCP CCTV video from the East Corridor near S306, CUA is seen walking down the corridor wearing the same jean jacket, grey gloves, dark sweatshirt, and red hat. CUA is seen carrying what appears to be a baton in his right hand and a cellular phone in his left hand.



52.     During the same video, CUA is seen attempting to open a brown door at an approximate timestamp of 0:19. As he continues down the corridor, CUA is observed wearing the same previously identified attire, including the dark sweatshirt with logo, while twirling a baton in his right hand.





53.     On January 21, 2021, C1 provided the FBI with a photograph taken from a law enforcement encounter between a local law enforcement department and CUA on January 3, 2021, in the jurisdiction where CUA lives in Milton, Georgia. In the photograph, CUA is seen wearing the same jean jacket and grey gloves that he wears in The New Yorker video and in USCP CCTV videos.



54.     On or about January 8, 2021, the FBI received a tip identifying CUA's Parler account, @PatriotBruno with name Brunocua, along with posts from CUA's account. In some of the posts, CUA referenced plans to travel to Washington, D.C. on January 6, 2021. In other posts, CUA stated, "President Trump is calling us to FIGHT!" and "This isn't a joke, this is where and when we make our stand. #January6th, Washington DC." The tip also stated CUA "actively encouraged the events on the sixth for 11 days leading up to the domestic terrorist attack."





55.     On December 19, 2020, CUA posted a video titled "Fight for Trump" with an image of "KAGWAR" on Instagram account bruno_cua. Based on my experience and training, I have learned that "KAGWAR" stands for "Keep America Great" War.





56.     Publicly available information on CUA's Instagram account, bruno_cua, also revealed several other social media accounts, including CUA's Instagram account, bruno_cua1776.



57.     In a publicly available post on Instagram account bruno_cua, CUA posted about creating Parler account Brunocua with display name @Brunocua on November 8, 2020. A screenshot of the account also included information for several other social media accounts: YouTube – Southern Adventures; Instagram – bruno_cua; and Tiktok – bruno_cua.

58.     Subsequent posts by CUA in approximately late December 2020 showed display name @PatriotBruno with same account name Brunocua.



59. On January 20, 2021, PROVIDER was served with a preservation letter under 18 U.S.C. § 2703(f) related to account PatriotBruno ("TARGET ACCOUNT").

60. On February 1, 2021, PROVIDER responded to a subpoena regarding the TARGET ACCOUNT. PROVIDER confirmed that @PatriotBruno corresponds with USER ID 6834095, and was created by the user with email brunocua@icloud.com and with phone number 404-387-8578 on November 8, 2020. According to legal process returns from Apple Inc. brunocua@icloud.com and phone number 404-387-8578 are registered to CUA.

61. Law enforcement is aware that the protest of January 6, 2021 had been planned for several weeks, and multiple persons coordinated the illegal entry of the U.S. Capitol Building, and this investigation also includes the activities of other persons who assisted, facilitated, participated in, and planned the illegal entry. As such, based on my experience and training, your affiant believes that there is information that identifies other persons associated with the person identified

as controlling the TARGET ACCOUNT, which is information that constitutes evidence, fruits, and instrumentalities of the Subject Offenses.

62.     The TARGET ACCOUNT is likely to contain location information, including IP data associated with posts and logins as well as geolocation data associated with photographs, which may identify a user's location during a specific time period relevant to the Subject Offenses such as during the breach of the Capitol.

63.     Individuals engaged in criminal conduct, such as the Subject Offenses, sometimes use online accounts, such as the TARGET ACCOUNT, to communicate with co-conspirators and criminal associates regarding, among other things, travel and meeting plans. Thus, the TARGET ACCOUNTS are likely to include evidence identifying the user(s) of the TARGET ACCOUNTS as well as other co-conspirators who may be involved in the Subject Offenses and additional electronic accounts that may contain other evidence of the Subject Offenses.

64.     Furthermore, with respect to the TARGET ACCOUNT, information concerning contacts, photographs, group memberships, and patterns of electronic communications with individuals associated with similar social media accounts can provide evidence that is probative of the users' and any co-conspirators' social networks, contacts, travel, banking, and other financial facilities, and potential knowledge of or involvement in one or more of the Subject Offenses.

## BACKGROUND CONCERNING PARLER[5]

---

[5] The information in this section is based on publicly available information, including, but not limited to, the following webpages: "How to Use Parler," https://vocal.media/01/parler-101-how-to-use-the-free-speech-social-media-platform; "Parler: How it Works," https://medium.com/the-innovation/parler-how-it-works-and-why-its-so-quiet-over-there-8e41234860c7;  "Parler," https://en.wikipedia.org/wiki/Parler; and "Data collection cheat sheet: Parler," https://cybernews.com/privacy/how-parler-twitter-facebook-mewe-data-policies-compare/#parler. Your affiant does not purport to know all of Parler's user guidelines and policies regarding use of Parler.

65.     Parler is a service owned by PROVIDER, which is the provider of the internet-based account identified by @PatriotBruno. PROVIDER is a United States company and a provider of an electronic communications service as defined by 18 U.S.C. §§ 3127(1) and 2510. Specifically, Parler is a free-access social networking service, accessible through its website and its mobile application, that allows subscribers to acquire and use Parler accounts, like the target account listed in Attachment A, through which users can share messages, multimedia, and other information with other Parler users and the general public.

66.     In 2018, Parler, LLC launched the privacy-focused, microblogging and social networking platform "Parler."[6] Parler previously could be accessed via the web at "https://www.parler.com" or could be downloaded as an application on a mobile device via Google's Play Store or Apple's App Store.  Since January 6, 2021, Google and Apple decided to remove the app from their stores, and Amazon suspended Parler from its Web-hosting service at midnight on Monday, January 11, 2021.  Law enforcement has made contact with Parler, though, and they are accepting service of process, which they will respond to as soon as they regain access to their data.

67.     In order to make comments and post content on Parler's network, a new user—or "Parleyer"—must create a Parler account. The account creation process involves the new user providing Parler with an email address and phone number, as well as a password. After creating the account, the user may update his or her account information with a profile photo and may choose other Parler accounts, such as news networks or individuals, to follow.

---

[6] Although the service takes its name from the French verb "parler" (pronounced "par-lay"), meaning "to speak," Parler is pronounced "parlor."

68.     The new user's feed will be populated, in chronological order, by written posts and media (*i.e.*, image and video files) associated with the accounts that the new user has chosen to follow. Posts are referred to as "Parleys" on Parler. A Parler user will receive a notification: (1) when Parler accounts the user follows create new Parleys, (2) when any Parler account "echoes" (*i.e.*, shares) the user's Parley, and (3) when any other account votes on the user's own Parleys (either an upvote, which is a sign of agreement, or a downvote, which a sign of disapproval). Parleys are limited to 1,000 characters in length. And, as is the case with other social media platforms, like Twitter and Facebook, Parler users may include hashtags (*i.e.*, a metadata tag prefaced by the hash symbol ("#")) in their Parlays as a form of user-generated tagging for cross-referencing content related to a particular subject or theme.[7]

69.     Parler offers five different "verification badges" for a user's profile, based on the user's relationship to the platform and the public.

    a.   The first type of badge is the gold "Verified Influencer" badge. People with a large following who have the potential to be targeted for impersonation, hacking, or phishing campaigns may apply for a "Verified Influencer" badge. This badge is to protect the profile's authenticity and prove the user's identity to the Parler community.

    b.   The second type of badge is the blue media partner badge. Blue badge partners use the Parler "commenting plugin" to import articles, content, and comments from the partner's website. Public comments made on the articles and posts outside of the Parler platform will also be mirrored on the partner's Parler account.

---

[7] Parler also has a search function that enables its users to search Parler for keywords, usernames, or pages, among other things.

c.   The third type of badge is the "Parler Affiliate" badge, which permits Parler to auto-post articles directly from the affiliate's website.

d.   The fourth type of badge is a black badge, indicating that an account is private. Parler users can choose between having a public or a private profile. If a user chooses to have a public account, then (1) anyone with Internet access can see (but not comment on) the public user's posts, and (2) all Parler users can see, comment, echo, and vote on the user's posts. In contrast, a private Parler user only shares his or her Parleys with accounts the user approves.

e.   Finally, the fifth badge is the red badge, which indicates that a user is a "real user."[8] This optional verification process provides "Parler Citizen" status. This step requires that the account owner use his or her web camera to take a photograph of the front and back of the owner's government-issued identification (*e.g.*, driver's license).[9] Then, the owner must submit a "selfie" taken with the web camera.[10] Real users are verified, unique people on Parler's network, but this does not mean the user is who they claim to be, just that they are "real users," not computer-generated bots.[11]

---

[8]  As is the case with other social media sites, Parler users must be at least 13 years old to sign up for an account.

[9]  According to Parler's Privacy Policy (https://legal.parler.com/documents/privacypolicy.pdf), Parler retains only an anonymized hash, corresponding to the information the identification document contains, in order to prevent identify theft and impostor accounts. Parlor's Privacy Policy states that "[n]o personally identifiable information from [a user's] account can be retrieved from the stored hash."

[10]  According to Parler's Privacy Policy, Parlor retains the selfie to prevent the creation of impostor accounts, but they store the selfies in encrypted form.

[11]  Regardless of whether a Parler user has a public or private profile, all Parler users may "block" those with whom they do not wish to communicate. Blocking a user makes it so that the blocked account will not see that the other user's account exists.

70.     Parler also offers its users a private messaging platform where they can exchange "direct messages." These messages are sent to the recipient's "Messaging" inbox on Parler. These direct messages are stored in the user's inbox, as well as on Parler's network. Furthermore, if a user contacts Parler directly, Parler may retain the content of those communications, as well as any attachments.

71.     Per Parler's Privacy Policy, Parler collects any information a user chooses to provide to Parler, such as Parleys, follows, photographs, videos, GIFs (Graphics Interchange Format images), comments, votes, and echoes. And, if a user permits Parler to access the address book on the user's device or gives Parler permission to import contacts from an email account associated with a Parler account, Parler may access and store names and contact information from the user's address book and/or contact lists.

72.     Parler also retains payment-related information, such as credit and debit card or automated clearing house (ACH) information, which is stored by Parler's third-party payment processor on Parler's behalf. Parler allows its users to monetize their content and following through "tipping." Users can connect a credit card to their account and then use that means of payment to tip other users, enabling users to be paid for publishing content on the site. As part of that functionality, Parler collects information from tax form W-9, as required by the Internal Revenue Service. Parler retains that information, in encrypted form, for purposes of legal compliance.

73.     With regard to location and tracking information, Parler may retain information about the device and software a customer uses to access Parler's services, including Internet Protocol ("IP") addresses, device type, web browser type, operating system version, phone carrier and manufacturer, member agents, application installations, device identifiers, mobile advertising identifiers, and push notification tokens. Parler and its third-party partners, such as analytics

34

partners, may also collect and retain information using session and persistent cookies, pixel tags, and similar technologies.

74.     With regard to a user's interaction with Parler's platform, Parler receives and retains information about a user's posts or other content viewed, the searches conducted, the people followed, and the dates and times a user visits Parler's website or mobile application.

75.     Parler allows any user to get verified, which requires a user submit a photograph showing the front and back of a state-issued ID to Parler, plus a photograph of the user ("selfie"). Users have the option to only allow comments on parleys from verified users. Parler deletes the front and back scans of IDs when they are no longer needed, retaining a "hash corresponding to the information the identification document contains." Parler also retains the selfie but claims to store it "securely, in encrypted form."

76.     Parler shares user data with vendors and analytics and in response to legal requests.

77.     Social networking providers like PROVIDER typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number).  In some cases, users may communicate directly with PROVIDER about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users.  Social networking providers like PROVIDER typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

78.     PROVIDER also allows its subscribers to access its various services through an application that can be installed on and accessed via cellular telephones and other mobile devices.

This application is associated with the subscriber's PROVIDER account.  In my training and experience, I have learned that when the user of a mobile application installs and launches the application on a device (such as a cellular telephone), the application directs the device in question to obtain a Push Token, a unique identifier that allows the provider associated with the application (such as PROVIDER) to locate the device on which the application is installed.  After the applicable push notification service (*e.g.*, Apple Push Notifications (APN) or Google Cloud Messaging) sends a Push Token to the device, the Token is then sent to the application, which in turn sends the Push Token to the application's server/provider.  Thereafter, whenever the provider needs to send notifications to the user's device, it sends both the Push Token and the payload associated with the notification (*i.e.*, the substance of what needs to be sent by the application to the device).  To ensure this process works, Push Tokens associated with a subscriber's account are stored on the provider's server(s).  Accordingly, the computers of PROVIDER are likely to contain useful information that may help to identify the specific device(s) used by a particular subscriber to access the subscriber's PROVIDER account via the mobile application.

79.     Based on my training and experience, I know that providers such as PROVIDER use cookies and similar technologies to track users visiting PROVIDER's webpages and using its products and services.  Basically, a "cookie" is a small file containing a string of characters that a website attempts to place onto a user's computer.  When that computer visits again, the website will recognize the cookie and thereby identify the same user who visited before.  This sort of technology can be used to track users across multiple websites and online services belonging to PROVIDER.  More sophisticated cookie technology can be used to identify users across devices and web browsers.  From training and experience, I know that cookies and similar technology used by providers such as PROVIDER may constitute evidence of the criminal activity under

investigation.  By linking various accounts, devices, and online activity to the same user or users, cookies and linked information can help identify who was using a PROVIDER account and determine the scope of criminal activity.

80.    Based on my training and experience, I know that PROVIDER maintains records that can link different PROVIDER accounts to one another, by virtue of common identifiers, such as common e-mail addresses, common telephone numbers, common device identifiers, common computer cookies, and common names or addresses, that can show a single person, or single group of persons, used multiple PROVIDER accounts.  Based on my training and experience, I also know that evidence concerning the identity of such linked accounts can be useful evidence in identifying the person or persons who have used a particular PROVIDER account.

81.    Based on my training and experience, I know that subscribers can communicate directly with PROVIDER about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users.  Providers such as PROVIDER typically retain records about such communications, including records of contacts between the user and the provider's support services, as well records of any actions taken by the provider or user as a result of the communications.  In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

82.    In summary, based on my training and experience in this context, I believe that the computers of PROVIDER are likely to contain user-generated content such as stored electronic communications (including retrieved and unretrieved messages for PROVIDER subscribers), as well as PROVIDER-generated information about its subscribers and their use of PROVIDER services and other online services.  In my training and experience, all of that information may

constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.  In fact, even if subscribers provide PROVIDER with false information about their identities, that false information often nevertheless provides clues to their identities, locations, or illicit activities.

83.     As explained above, information stored in connection with a Parler account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the investigating authorities to establish and prove each element of the offense or, alternatively, to exclude the innocent from further suspicion.  From my training and experience, a Parler user's IP log, stored electronic communications, and other data retained by PROVIDER, can indicate who has used or controlled the Parler account.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, profile contact information, private messaging logs, status updates, and "tagged" photos (and the data associated with the foregoing, such as date and time) may indicate who used or controlled the Parler account at a relevant time.  Further, Parler account activity can show how and when the account was accessed or used.  For example, as described above, PROVIDER logs the IP addresses from which Parler users access their accounts along with the time and date.  By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation.  Such information allows investigators to understand the geographic and chronological context of Parler access, use, and events relating to the crime under investigation.  Additionally, PROVIDER builds geo-location into some of its Parler services.  Geo-location allows, for example, users to "tag" their location in posts and Parler "followers" to locate each other.  This geographic and timeline information may tend to either

inculpate or exculpate the Parler account user.  Last, Parler account activity may provide relevant insight into the Parler account user's state of mind as it relates to the offense under investigation.  For example, information on the Parler account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).[12]

## <u>REQUEST TO SUBMIT WARRANT BY TELEPHONE<br>OR OTHER RELIABLE ELECTRONIC MEANS</u>

84.     I respectfully request, pursuant to Rules 4.1 and 41(d)(3) of the Federal Rules of Criminal Procedure, permission to communicate information to the Court by telephone in connection with this Application for a Search Warrant. I submit that Assistant U.S. Attorney Kimberly L. Paschall, an attorney for the United States, is capable of identifying my voice and telephone number for the Court.

---

[12] At times, social media providers such as PROVIDER can and do change the details and functionality of the services they offer.  While the information in this section is true and accurate to the best of my knowledge and belief, I have not specifically reviewed every detail of PROVIDER's services in connection with submitting this application for a search warrant.  Instead, I rely upon my training and experience, and the training and experience of others, to set forth the foregoing description for the Court.

## **CONCLUSION**

85.     Based on the forgoing, I request that the Court issue the proposed search warrant. Because the warrant will be served on PROVIDER, who will then compile the requested records at a time convenient to it, there exists reasonable cause to permit the execution of the requested warrant at any time in the day or night.  Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

Date: February 3, 2021                               Respectfully submitted,

                                                                 _____
                                                                 Daniel Mehochko
                                                                 Special Agent
                                                                 Federal Bureau of Investigation

*Subscribed and sworn pursuant to Fed. R. Crim. P. 4.1 and 41(d)(3) on February 3, 2021.*

                                        _____
                                        ZIA M. FARUQUI
                                        U.S. MAGISTRATE JUDGE

## CERTIFICATE OF AUTHENTICITY OF DOMESTIC RECORDS PURSUANT TO FEDERAL RULES OF EVIDENCE 902(11) AND 902(13)

I, _____, attest, under penalties of perjury by the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this certification is true and correct.  I am employed by _____ ("PROVIDER"), and my title is _____.
I am a custodian of records for PROVIDER, and I am qualified to authenticate the records attached hereto because I am familiar with how the records were created, managed, stored, and retrieved.  I state that the records attached hereto are true duplicates of the original records in the custody of PROVIDER.  The attached records consist of:

_____

[GENERALLY DESCRIBE RECORDS (pages/CDs/megabytes)]

I further state that:

a.      all records attached to this certificate were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of PROVIDER, and they were made by PROVIDER as a regular practice; and

b.      such records were generated by PROVIDER's electronic process or system that produces an accurate result, to wit:

1.      the records were copied from electronic device(s), storage medium(s), or file(s) in the custody of PROVIDER in a manner to ensure that they are true duplicates of the original records; and

2.      the process or system is regularly verified by PROVIDER, and at all times pertinent to the records certified here the process and system functioned properly and normally.

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.


_____          _____
Date                                    Signature